UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARINA TOMA,

                Petitioner,                      Case Number 20-11071

v.                                                      Honorable David M. Lawson

REBECCA ADDUCCI, Detroit District
Director, United States Immigration and
Customs Enforcement, MATTHEW T. ALBENCE,
Director, United States Immigration and
Customs Enforcement, KEVIN MCALEENAN,
Secretary of the United States Department of
Homeland Security, and WILLIAM P. BARR,
United States Attorney General,

                Respondents.
_____/

## OPINION AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AS PRELIMINARY INJUNCTION

Petitioner Marina Toma filed an emergency petition for a writ of habeas corpus on May 1, 2020, and four days later filed an emergency motion for a temporary restraining order (TRO). Toma is a 33-year-old Iraqi national who is currently detained by the United States Immigration Customs and Enforcement Agency ("ICE") at the Chippewa Correctional Facility in Sault Ste. Marie, Michigan. She has been in ICE custody since October 8, 2019, scheduled to be removed to Iraq because of her conviction of an "aggravated felony." The Immigration Court granted her petition for withholding of removal under the United Nations Convention Against Torture. The government appealed that decision, and Toma remains in custody while the appeal is pending. She alleges that (1) her continued detention during the coronavirus pandemic violates her Fifth Amendment right to substantive due process by subjecting her to unlawful punishment and unsafe conditions of confinement; and (2) her detention, now in excess of six months, is unconstitutional because she will not be removed in the foreseeable future due to the pandemic and political turmoil

in Iraq. The government opposes the petition and the motion for a TRO. Because Toma has not demonstrated a likelihood of success on the merits of her petition, and other relevant factors do not favor her immediate release, the Court will deny her motion for a TRO.

I. Facts and Proceedings

Toma is an Iraqi national who was admitted to the United States as a lawful permanent resident in March 1996 when she was eight years old. She is 33 years old now and normally resides in Macomb County, Michigan. She has made America home, has a three-year-old son in this country (who is living with her mother), and maintains little to no connection with Iraq. Although she has a basic level of Arabic proficiency, she cannot read nor write the language. She does not have an Iraqi passport, travel document, or identity card, and she does not have family in Iraq; they all moved to the United States.

Toma has had several run-ins with local and federal authorities, which resulted in the initiation of removal proceedings at least twice. In April 2010, ICE charged her as removable under 8 U.S.C. § 1227(a)(2)(B)(i) based on a conviction for a state-law controlled substance offense (possession of methamphetamine/ecstasy). However, in August 2010, the Immigration Court granted Toma's application for cancellation of removal under 8 U.S.C. § 1229b(a), which provides a mechanism for cancelling removal proceedings against lawful permanent residents who have resided in the United States and who have not committed any aggravated felonies.

ICE again initiated removal proceedings against Toma in May 2018, while she was in the custody of the Michigan Department of Corrections (MDOC) for a 2018 state conviction for larceny in a building. Because that crime is considered an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(G), ICE charged Toma as removable under 8 U.S.C. § 1227(a)(2)(A)(iii), which subjected her to mandatory detention under 8 U.S.C. § 1226(c)(1)(B).

The MDOC released Toma to ICE custody on October 8, 2019. She was housed first at the Calhoun County Correctional Center in Battle Creek, Michigan, pending resolution of her removal proceedings. Later, she was transferred to Chippewa County Correctional Center in Sault Ste. Marie, Michigan, on December 17, 2019. On March 3, 2020, the Immigration Court granted Toma withholding of removal under the United Nations Convention Against Torture, finding that she faced "a particularized threat of torture to which the Iraqi government either acquiesces or is willfully blind."

The government appealed that decision to the Board of Immigration Appeals (BIA) on April 1, 2020. The appeal renders the Immigration Court's decision non-final, and therefore Toma is still subject to mandatory detention and remains detained at the Chippewa County Correctional Center.

Toma alleges that she is "particularly vulnerable to serious illness or death if infected by COVID-19," because she has "grave underlying medical conditions." She identifies those conditions as having surgical implants (plates and rods) to treat injuries received in a traffic accident several years ago; "blood pressure issues"; and skin rashes, bumps and itching. According to ICE deportation officer Christopher McClain, the detention center's medical records reveal that Toma has received treatment for some of those ailments. They also show that Toma has not reported any symptoms consistent with COVID-19. Upon entering the facility, Toma told medical staff that she suffered from a skin rash and constipation, had rods in her knee and shoulder from a 2013 car accident, and had a diagnosed history of anxiety and depression. She also indicated that she previously used Xanax and Vicodin.

McClain also testified in his declaration that the medical staff at Chippewa were attentive to Toma's needs. On January 28, 2020, Toma complained about hemorrhoid pain, for which staff

gave her an ointment. On February 28, 2020, Chippewa staff completed a psychological referral and prescribed anti-depressants. Toma also complained about knee pain at times, for which staff gave her acetaminophen. On April 6, 2020, Toma requested, but then later refused, to see a nurse. She has active medication orders for Triamcinolone cream (for the rash), MiraLAX (for constipation), Claritin (for allergies), acetaminophen (for pain), and Prozac (for depression).

However, Toma insists that "she has been unable to get adequate treatment" for her medical conditions while in ICE custody. She alleges that her knee has recently swollen greatly, becoming a possible source of infection, and despite sending "numerous kites and requests for treatment," Toma "has not received regular treatment from a licensed physician."

On May 1, 2020, Toma filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking release from ICE detention due to the coronavirus pandemic. She then filed a motion for a temporary restraining order on May 5, 2020, asking the Court to order her immediate release. The government filed a timely response to the petition and the motion.

## II.  Discussion

Section 2254 authorizes federal courts to hear petitions for writs of habeas corpus filed by "a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(a). Because Toma is detained by ICE under federal law, and not by order of a state court, the Court will construe her petition as one filed under 28 U.S.C. § 2241, which applies generally to federal prisoners and detainees. Although Toma's main complaint addresses the conditions of her confinement, normally the subject of a lawsuit under 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), *see Lutz v. Hemingway*, 476 F. Supp. 2d 715, 718 (E.D. Mich. 2007), Toma argues that "the *only* remedy that will vindicate their due process right under the Fifth Amendment is release from custody," *Awshana v. Adducci*, --- F. Supp. 3d -

--, No. 20-10699, 2020 WL 1808906, at *2 (E.D. Mich. Apr. 9, 2020). The Court, therefore, has jurisdiction to entertain her claim under section 2241, *see Perez-Perez v. Adducci*, No. 20-10833, 2020 WL 2305276, at *2 (E.D. Mich. May 9, 2020), a proposition that the government does not contest.

Although the petitioner styled her motion as one for a temporary restraining order, she gave notice to the government and did not seek a ruling before the government could respond. Her request should be characterized more properly as a motion for a preliminary injunction. Federal Rule of Civil Procedure 65 governs both. A temporary restraining order (TRO) may be issued without notice to the opponent and is meant to preserve the status quo until a court can make a reasoned resolution of a dispute. Fed. R. Civ. P. 65(b)(1); *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 226 (6th Cir. 1996). TROs are of a short duration and usually terminate with a ruling on a preliminary injunction. *Workman v. Bredesen,* 486 F.3d 896, 922 (6th Cir. 2007); Fed. R. Civ. P. 65(b). Here, because the defendants are on notice, the Court will treat the petitioner's motion as one for a preliminary injunction rather than a motion for a temporary restraining order. This linguistic difference is largely academic as the same factors apply to both. *See Ohio Republican Party v. Brunner,* 543 F.3d 357, 362 (6th Cir. 2008).

The petitioner bears the burden of demonstrating entitlement to injunctive relief. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Generally, courts consider four factors in determining whether to grant a preliminary injunction: "(1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017) (citing *Overstreet v.*

*Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

### A. Likelihood of Success

#### 1. Unconstitutional Conditions of Confinement Claim

The basis of Toma's claim is a well-accepted premise: "[W]hen the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general wellbeing." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted). Toma says that the defendants cannot meet that obligation when a highly contagious virus is introduced into the close confinement that is inherent in a custodial environment. This is not a novel argument. In the immigration context, courts have released individuals who fell within one of the CDC's high-risk categories for complications from COVID-19, or who were housed in detention facilities with confirmed cases, or both. *Jones v. Wolf,* No. 20-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2020) (granting relief for detainees with chronic medical conditions held in a detention facility with no confirmed COVID-19 cases); *Basank v. Decker,* No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); (granting relief for detainees with chronic medical conditions held in a facility with confirmed cases of COVID-19); *Coronel v. Decker*, --- F. Supp. 3d ---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (same); *Malam v. Adducci*, --- F. Supp. 3d ---, 2020 WL 1672662, at *5 (E.D. Mich. April 5, 2020) (granting relief for petitioner in high-risk category but held in facility with no confirmed cases); *Zaya v. Adducci*, No. 20-10921, WL 1903172 (E.D. Mich. April 18, 2020) (same).

Toma argues that her continued detention during the coronavirus pandemic violates her substantive right to due process guaranteed by the Fifth Amendment to the United States Constitution because it jeopardizes her health and medical wellbeing. The Due Process Clause prohibits the federal government from depriving any "person . . . of . . . liberty without due process of law." U.S. Const. amend. V. "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id*. at 693.

The government has an obligation to furnish appropriate medical care for both convicted defendants and detainees alike. For convicted defendants, that obligation is established by the Eighth Amendment. *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Helling*, 509 U.S. at 31. For detainees, whose rights include protections that are at least as substantial as the Eighth Amendment protections available to a convicted prisoner, *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004) (holding that civil detainees are entitled to superior conditions of confinement than prisoners and pretrial detainees), the Due Process Clause sets the standard, *see City of Revere v. Massachusetts Gen. Hosp*., 463 U.S. 239, 244 (1983). Nonetheless, claims relating to health concerns by detainees are analyzed using an Eighth-Amendment, deliberate-indifference framework. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

That framework calls for proof that detention officials were deliberately indifferent to a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). The applicable test has two elements. *Id*. at 834. First, the petitioner must demonstrate that the constitutional

deprivation was "objectively, 'sufficiently serious.'" *Ibid.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, she must demonstrate that the detention official had a "sufficiently culpable state of mind." *Ibid.* This element can be proven by circumstantial evidence from which the fact finder can conclude that the state actor perceived the risk, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), or "from the very fact that the risk was obvious." *Terrance v. Northville Reg'l Psychiatric Hospital*, 286 F.3d 834, 843 (6th Cir. 2002).

In *Helling v. McKinney*, the Supreme Court held that a prisoner could state a claim under the Eighth Amendment by alleging that officials "exposed him to levels of [environmental tobacco smoke] that pose[d] an unreasonable risk of serious damage to his future health." 509 U.S. at 35. To satisfy the objective prong, the plaintiff had to show both that he was "being exposed to unreasonably high levels of [environmental tobacco smoke]" and that "society consider[ed] the risk that the prisoner complain[ed] of to be so grave that it violate[d] contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 35, 36 (emphasis in original). The plaintiff must produce "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood [of] injury." *Id.* at 36. To succeed on the subjective prong, the plaintiff had to show that "the prison authorities' current attitude and conduct" amounted to deliberate indifference. *Ibid.*

However, "a remedy for unsafe conditions need not await a tragic event," and the plaintiff need not allege present harm to succeed on an unconstitutional-conditions claim. *Id.* at 33. In *Helling*, the Court rejected the government's argument that the plaintiff's claim was not cognizable because he had not alleged any present harm. The Court explained that the government may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Ibid.* The Court noted some examples of circumstances

where inmates may obtain injunctive relief to remedy life-threatening conditions even though "nothing yet had happened to them." *Ibid*. One example was the "exposure of inmates to serious, communicable disease [even if the] inmate shows no serious current symptoms." *Ibid*.

No one can deny that the health risks caused by the pandemic are grave. Objectively, the health risks posed by COVID-19 are abundantly clear. The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans, and easily spreads from person to person. There is currently no approved vaccine or antiviral treatment for this disease. Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated that between 100,000 and 240,000 people in the United States will die from COVID-19 related complications. Michael D. Shear *et al.*, Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/us/ politics/coronavirus-death-toll-united-states.html.

The Centers for Disease Control and Prevention (CDC) have advised that "[p]eople aged 65 years and older" may be at higher risk for severe illness from COVID-19. *People Who Are at Higher Risk*, Centers for Disease Control and Prevention (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The CDC also has identified persons with certain medical conditions as being at high risk, including those with "serious heart conditions." *Ibid*. That includes "heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension." *At Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

On March 23, 2020, the CDC issued further guidance acknowledging that detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Guidance for Correctional & Detention Facilities*, Centers for Disease Control and Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. "The CDC noted that many detention conditions create a heightened risk [for] detainees. These include low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020).

Toma contends that she is particularly susceptible to COVID-19-related complications due to a "number of ailments, for which she takes medication." However, from the list of her ailments (metal plates in her body from a car accident, skin problems, a bump in her breast, and "blood pressure issues"), only the "blood pressure issues" possibly fall within the CDC's high-risk categories.

Although the CDC recognizes "pulmonary hypertension" as a serious heart condition that may put people at a higher risk of severe COVID-19-related complications, Toma's allegations are extraordinarily vague. *See At Risk for Severe Illness*, *supra*. In her petition for a writ of habeas corpus and motion for a TRO, Toma alleged only that she "has blood pressure issues." She provided no background about her alleged "issues." Even after the government called out the lack of any supporting detail for the allegation, Toma never beefed up her assertion in her reply. She merely restated for the third time that she "has blood pressure issues."

Toma's vague allegation is problematic for two reasons. First, it calls into question the credibility of her claim. She never alleged that her condition was diagnosed, never mentioned that she takes medication to address her "blood pressure issues," nor has she mentioned that her blood pressure affects her life in anyway. Second, the lack of detail hinders the Court's ability to evaluate the risk of danger that Toma faces. For instance, "blood pressure issues" could mean high systemic blood pressure, low systemic blood pressure, or the various forms of pulmonary hypertension. *See, e.g., Pulmonary Hypertension-High Blood Pressure in the Heart-to-Lung System*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/pulmonary-hypertension-high-blood-pressure-in-the-heart-to-lung-system (last visited May 30, 2020) (comparing pulmonary and systemic blood pressure).

Without more background, there is no basis to find that Toma's "blood pressure issues" place her within a high-risk group of developing severe COVID-19-related complications. Not to belittle her other medical conditions, but the CDC does not recognize the existence of surgical implants, bumps (unless cancerous), and skin rashes as medical conditions that carry a heightened risk of COVID-19-related complications. Therefore, as a 33 year-old-woman with no concrete ailments identified by the CDC's COVID-19 guidelines, Toma does not face a heightened risk of serve complications should she contract the virus.

Although Toma does not pose a heightened risk of developing severe complications, she is housed in a congregant environment that could increase her risk of contracting the virus. She asserts that the facility was "designed for communal living, eating, sleeping, and recreating" and complains that "detainees share toilets, sinks, phones, and showers, eat in communal spaces, and are in close contact with other detainees and officers." "This violates recommended guidelines to socially distance with at least six feet distance between people and for no more than ten people to

gather in one space." *Fofana v. Albence*, No. 10-10869, 2020 WL 1873307, at *9 (E.D. Mich. April 15, 2020) (citing *Awshana*, 2020 WL 1808906 at *8).

However, there have been no reported or suspected cases of the novel coronavirus in the Chippewa detention center as of May 29, 2020. Of course, that account may not be entirely accurate as the government "is silent as to how many, if any, detainees have been tested for COVID-19" in the jail. *Fofana,* No. 10-10869, 2020 WL 1873307, at *9. Nonetheless, not only does the detention facility lack any confirmed cases, but the surrounding Chippewa County has been relatively unscathed, having reported only two positive cases and no deaths since the outbreak several months ago. *See* Coronavirus, Michigan.Gov, https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html. Moreover, Toma is housed alone in a cell designed for six people. She seeks to go home to Macomb County where, as of May 30, 2020, there were 6,616 confirmed cases of COVID-19 and 793 deaths. *See Coronavirus*, *supra*. If infection from the novel coronavirus is the petitioner's main concern, logic does not support the remedy she seeks. Other courts have made similar observations. *Marqus v. Adduci*, No. 10-11121, 2020 WL 2525943 (E.D. Mich. May 18, 2020); *Murai v. Adduci*, No. 20-10816, 2020 WL 2526031, at * (E.D. Mich. May 18, 2020) (denying habeas relief to immigrant detainee at Calhoun County Detention Center, which had two confirmed cases, partly because the detainee would be released from "a controlled environment with minimal confirmed cases in the general population at Calhoun, only to encounter, and be free to roam within, a civil society [] experiencing tens of thousands of cases.").

To satisfy the subjective element of her claim, the petitioner must demonstrate that the government subjected her to objectively poor confinement conditions with deliberate indifference to her health and safety. *Farmer*, 511 U.S. at 834. Without demonstrating objectively poor

confinement conditions, however, the petitioner cannot demonstrate the government was deliberately indifferent to her health and safety in violation of her due process right.

Even if the Court were to assume that Toma's conditions of confinement were objectively poor, Toma has not shown that ICE was deliberately indifferent to her confinement conditions. The government has taken commendable steps to stem the spread of the pandemic. Following CDC guidance, Chippewa staff assess detainees for fever and respiratory illness during intake medical screenings and ask about any possible exposure to the virus. The government's plan — which it has not had to deploy, yet — is to house those with confirmed exposure in separate cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee). Those who present with COVID-19 symptoms would be isolated, tested, and treated if necessary. The government recently provided all detainees with surgical-grade masks, which must be worn at all times outside of the housing unit. However, although these measures are certainly commendable, "the fact is that none of the steps [taken] . . . includes the 'social distancing measures recommended—especially for high-risk individuals—by the CDC . . ." *Jones v. Wolf,* No. 20-361, 2020 WL 1643857, at *10 (W.D.N.Y. Apr. 2, 2020).

The problem for Toma is that she can point only to the lack of social distancing measures. She cannot argue that the government ignored her high-risk status, failed to treat someone suffering from COVID-19 adequately, or ignored the threat level when someone associated with the detention facilities tested positive for the virus. And although she complains that "she has been unable to get adequate treatment" for her medical conditions while in ICE custody, the medical records show otherwise.

Toma has "not demonstrated a substantial likelihood of success on [her] fundamental argument—i.e., that the defendant facility is incapable of protecting [her] from contracting

COVID-19 or providing appropriate medical attention should [s]he be infected." *Sacal-Micha v. Longoria*, No. 20-CV-37, 2020 WL 1518861, *5 (S.D. Tex. March, 27 2020). The petitioner offers only conclusory arguments based on the contagious nature of COVID-19 and the potential to spread in detention facilities.

Finally, the government's legitimate interests in detaining Toma outweigh her concerns over the conditions of her confinement. The seminal case dealing with the constitutionality of conditions of confinement of non-convicted detainees is *Bell v. Wolfish,* 441 U.S. 520 (1979). There, the Supreme Court held that such claims are governed by the Due Process Clause, a proposition that is now well accepted. *See, e.g.*, *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008) (reiterating that when a conditions-of-confinement claim "is asserted on behalf of a pre-trial detainee, the Due Process Clause . . . is the proper starting point"). But the Court also emphasized that those constitutional rights implicated by conditions of confinement, when analyzed for pretrial detainees under the Due Process Clause, must be balanced against the "Government['s] . . . legitimate interests that stem from its need to manage the facility in which the individual is detained." *Bell*, 441 U.S. at 540. Courts, therefore, must strike a balance "between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 546 (quoting *Wolff v. McDonell*, 418 U.S. 539, 556 (1974)). In striking that balance, courts must give great deference to the custodians "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *id.* at 547, lest courts become "enmeshed in the minutiae of prison operations." *Id.* at 562.

Here, ICE's "institutional interest" is continuing the mandatory detention of those aliens who have been "convicted of an aggravated felony at any time after admission" pending the

outcome of their removal proceedings. 8 U.S.C. § 1227(a)(2)(A)(iii); *id.* § 1226(c)(1)(B). When considering the remedy of a complete release from detention (albeit with conditions for supervision), the Court must strike a balance between the gravity of the risk of contracting COVID-19 (with uncertain outcomes for recovery and a path that could lead to death) with the danger to the public that could result from releasing the petitioner into the community. "When striking [that] balance between ICE's institutional need for continued detention and the petitioners' legitimate concerns over an unreasonable risk of serious damage to their future health, it is fair to require the petitioners to articulate something more than a generalized fear of exposure to disease in a detention facility. That only makes sense, since 'the requirements of due process are fluid and fact dependent.'" *Awshana*, 2020 WL 1808906, at *13 (quoting *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015)).

That balance favors the government. Toma is subject to mandatory detention for committing an aggravated felony (larceny from a building). Although she is not likely to be a flight risk due to her ties to the community, she has an extensive criminal history, which includes seven arrests for domestic violence and assault and battery (although those cases were dismissed), drunken driving, resisting and obstructing a police officer, and controlled substance violations. When held up against the relatively low risk of severe infection, the government's institutional interest outweighs the remedy of release.

Because Toma, a relatively healthy 33-year-old woman is subject to mandatory detention in a correctional facility with no confirmed or suspected cases of COVID-19, and is detained in a county that has been relatively unscathed by the coronavirus pandemic, she will not likely succeed on the merits of her unconstitutional confinement conditions argument.

2. Prolonged Detention Claim

Alternatively, Toma argues that her release is required by *Zadvydas v. Davis*, 533 U.S. 678 (2001), because she has been detained for over six months, and her removal from the United States is not substantially likely to occur in the reasonably foreseeable future. Once an alien has been ordered to be deported from our country, "the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')," 8 U.S.C. § 1231(a)(1)(A), and, during that period, "shall detain the alien," *Id*. § 1231(a)(2). Congress has authorized the Attorney General (now the Secretary of the Department of Homeland Security) to detain such an alien beyond the 90-day removal period under certain circumstances. *Id*. § 1231(a)(6). But "[i]n *Zadvydas* . . ., the Court interpreted this provision to authorize the Attorney General (now the Secretary) to detain aliens . . . only as long as 'reasonably necessary' to remove them from the country." *Clark v. Martinez*, 543 U.S. 371, 373 (2005) (quoting *Zadvydas*, 533 U.S. at 689, 699). The *Zadvydas* court held that reading section 1231(a)(6) to authorize indefinite detention would render the statute unconstitutional. *Zadvydas*, 533 U.S. at 690. Therefore, the Court "construe[d] the statute to contain an implicit 'reasonable time' limitation, the application of which is subject to federal-court review." *Id*. at 682. Six months has been found to be presumptively reasonable. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701.

Toma has been detained for almost seven months, and her removal does not appear imminent because Iraq suspended all flights to and from the county. *COVID-19 Information*, U.S. Embassy & Consulates in Iraq (Apr. 1, 2020), https://iq.usembassy.gov/covid-19-information;

*Hamama v. Adducci*, 349 F. Supp. 3d 665, 692-93 (E.D. Mich. 2019), *rev'd on other grounds*, 946 F.3d 875 (6th Cir. 2020) (finding that there is no significant likelihood that Iraqi nationals will be removed to Iraq in the reasonably foreseeable future due to political turmoil). However, Toma's continued detention does not transgress the principles laid down in *Zadvydas*, because she is not subject to a final order of removal. Because the Immigration Court has withheld removal, 8 U.S.C. § 1231(a), which outlines the detention procedures for individuals who have received final removal orders, no longer governs. Instead, Toma is subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(B), which requires "[t]he Attorney General [to] take into custody any alien who . . . is deportable by reason of having committed any offense covered in section [1227(a)(2)(a)(iii)]." Section 1227(a)(2)(A)(iii) covers "aggregated felonies," such as Toma's October 2018 conviction for larceny from a building.

That distinction is important. *Zadvydas* addressed only detention under section 1231(a)(6). Here, detention under section 1226(c) does not "implicate[] *Zadvydas*'s concern about indefinite detention," which "sprang from the observation that a 'statute permitting indefinite detention of an alien would raise a serious constitutional problem.'" *Hamama v. Adduci*, 946 F.3d 875, at 879 (6th Cir. 2020) (quoting *Zadvydas*, 533 U.S. at 690). As the Supreme Court noted in *Jennings v. Rodriguez*, --- U.S.---, 138 S. Ct. 830 (2018), section 1226(c), unlike section 1231(a), has a clear endpoint: "conclusion of asylum proceedings or entry of a removal order." *Ibid.* (citing *Jennings*, 138 S. Ct. at 846). Although the BIA may take its time to process the government's appeal of Toma's withholding of removal order, section "1226(c) [read with section 1226(a)] makes clear that detention of aliens within its scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.'" *Jennings*, 138 S. Ct. at 846 (quoting 8 U.S.C. § 1226(a)) (emphasis in original).

The cases plainly foreclose the relief Toma seeks under *Zadvydas*. She does not have a substantial likelihood of success on the merits of her confinement duration argument.

### B. Irreparable Injury

Toma must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). She must show that irreparable harm is "both certain and immediate, rather than speculative or theoretical." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). The "denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet*, 305 F.3d at 578; *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed"). But if a court finds it unlikely that a plaintiff will succeed on the merits of a constitutional claim, the "argument that [s]he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit." *Overstreet*, 305 F.3d at 578.

### C. Harm to Others and the Public Interest

"When the government opposes the issuance of a temporary restraining order, as Respondents do here, the final two factors — the balance of equities and the public interest — merge, because 'the government's interest is the public interest.'" *Malam*, 2020 WL 1672662, at *5 (quoting *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 512 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009))).

Although Toma is not likely a flight risk due to her family's established presence in America, the government has shown a legitimate interest in continued detention due to her conviction of an aggravated felony. She may pose a danger to society. *See* 8 U.S.C. § 1226(c); *Jennings*, 138 S. Ct. at 846. Toma's criminal history is not limited to the larceny conviction; she

was arrested repeatedly for domestic violence and was convicted of drunken driving, resisting and obstructing a police officer, and controlled substance violations. This factor slightly favors the government.

### III.  Conclusion

For the reasons stated above, the Court will construe the petitioner's motion for a temporary restraining order as a motion for a preliminary injunction. The relevant factors, on balance, do not favor granting the petitioner the relief she requests.

Accordingly, it is **ORDERED** that the petitioner's motion for a temporary restraining order, construed as a motion for a preliminary injunction (ECF No. 2) is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:  May 31, 2020